CHARLES DOHERTY *v.* STATE OF VERMONT.

May Term, 1901.

Present: TAFT, C. J., ROWELL, TYLER, MUNSON and START, JJ.

Opinion filed November 11, 1901.

*Criminal law—Insanity, in legal sense, indivisible*—While the numerous sub-divisions of insanity are convenient for purposes of description, the law does not, in strictness, recognize them, but deals with insanity irrespective of its varieties.

*Criminal law—Definition of an insane act*—If at the time of the commission of an act, the involuntary condition of the mental and moral faculties, or of the will, of the doer is such that he cannot distinguish between right and wrong, or is unconscious of the nature of the act, or is incapable of a controlling volition with respect thereto, the act is in law an insane act, and criminal liability cannot arise therefrom.

*Criminal law—An insane act may result from partial insanity*—Partial insanity, as well as general, may be such as to relieve the doer of a forbidden act from criminal responsibility therefor.

*Criminal law—Insanity—Delusions do not affect the quality of an act not resulting therefrom*—That one is at times subject to delusions does not affect the quality of an act that does not result from such delusions.

*Criminal law—Insanity—When there is no presumption in law of the continuance of insanity*—That one has been at times subject to delusions, does not raise a presumption of law that a specific act was an insane one. In the case of one who has been at times subject to delusions, the character of a specific act of his under consideration, and his mental condition at the time of its commission, must be determined without the aid of any legal presumption of the continuance of insanity.

*Criminal law—Petition for a new trial under V. S. 1997 and 1998*—A petition for a new trial brought under V. S. 1997 and 1998 on the ground of evidence discovered after the dismissal of a former petition, is not barred by such dismissal.

*Petition for a new trial under V. S. 1997 and 1998—Grounds of dismissal*—In this case, which was a petition for a new trial, in behalf of a respondent convicted of murder, based on the ground of newly discovered evidence of his insanity, the court, resolving any

doubts in favor of the respondent, and applying the principles of law applicable, was unable to reach any other conclusion upon the whole case than that the result of a new trial would be the same as was that of the former, and the petition was therefore dismissed.

PETITION for a new trial brought, under V. S. 1997 and 1998, by a respondent after his conviction of murder, and after the dismissal of a former petition for a new trial. This petition was based on evidence of insanity discovered after the trial and after the dismissal of the former petition, and was brought to the Supreme Court for Washington County, at its May Term, 1901, and heard at said term.

The testimony introduced on the trial of the respondent, and the testimony filed with the former petition, were referred to in this petition and made a part thereof. The defence of insanity was not made at the trial. Reference is made to *State v. Doherty,* 72 Vt. 402.

*Richard A. Hoar,* State's Attorney, and *William A. Lord* for the state.

*Frank Plumley* and *Edward H. Deavitt* for the petitioner.

TAFT, C. J. The petitioner was convicted of murder in November, 1899. The murder was committed in February of that year. At the trial the petitioner was thirty-three years old.

A petition for a new trial was heard in May 1900 and dismissed. *State v. Doherty,* 72 Vt. 402. That adjudication does not bar this proceeding, sec. 1998 V. S. The petition is based upon the ground that since the trial, testimony has been discovered showing that the petitioner at the time of the murder was insane. Under the former proceedings the testimony of nine witnesses was filed and under this, twenty-nine. In passing upon the question involved we consider the testimony filed under both petitions.

(Here follows a statement, which it is unnecessary to print, of the testimony of all the witnesses improved upon the question of the insanity of the petitioner.)

We have referred to all the facts in relation to the petitioner's insanity which the testimony tends in any respect to establish and the question before us is whether the testimony as a whole is of such force and character that upon another trial the result would be different from the result of the first trial. A pertinent inquiry in the outset is, what is the nature of the insanity which exempts one from crime. Writers on medical jurisprudence have displayed much ingenuity in endeavoring to classify the different phases of insanity. Under one heading a writer gathers in one series thirty-one different classes. Another dissatisfied with the above, and contending that utility should govern the classification, while recognizing the impossibility of creating any unassailable fabric of the kind, thinks that a division into fifty-six classes will best meet the requirements of both the legal and medical profession. The language of the learned,and of the medical experts,in describing its different phases, are apt to confuse the common mind and are really detrimental in the investigation of insanity in its legal sense. "The law does not recognize the division of insanity into numerous varieties, though convenient for purposes of description, insanity in the legal sense embracing all grades and conditions, being synonymous with unsoundness of mind." *St. George* v. *Biddeford,* 76 Me. 593.

Insanity is defined as such a mental condition as either from the existence of delusions or from incapacity to distinguish between right and wrong with regard to any matter under consideration does away with individual responsibility. Web. Int. Dic.

Insanity is a defence to any crime. The degree of insanity which excuses is well stated in *Davis* v. *United States,* 165

U. S. 373 : "The term insanity as used in this defence means, such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or when, though conscious of it, and able to distinguish between right and wrong, and knows the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily, so completely destroyed that his actions are not subject to it, but are beyond his control."

A more concise definition is given in Bish. New Cr. Law, sec. 396 a.   "One is insane who, from whatever cause, is incompetent to have the criminal intent, or who is incapable of so controlling his volition as to avoid doing the forbidden thing." If one's mental and moral faculties are so disordered and deranged that he cannot distinguish between right and wrong, or is not conscious at the time of the nature of the act he is committing, or if conscious of it and able to distinguish between right and wrong, yet if his mind or will is, involuntarily, so completely destroyed that he cannot control his actions, he is in a legal sense insane and is not subject to punishment for criminal acts committed when in such a state.   Insanity may be general or it may be partial, but "whether the insanity is general or partial the degree of it must have been so great as to control the will of its subject, and to have taken from him the freedom of moral action." *Com.* v. *Mosher,* 4 Pa. St. 264.

Such being the rule in regard to the insanity which excuses crime we refer now to the testimony before us and which it is evident must be produced upon another trial.   First as to the testimony concerning heredity.   It is not probable that it can be found upon the testimony that any relative of the petitioner, unless it may be an aunt of the half blood, "Funny

Rosa," was insane. One witness said that the father seemed to be so but that was merely his opinion based upon what he saw of him. He said he would act queer and would work two or three days and pay no attention to anyone; that he was nervous and peculiar. The facts upon which he based his opinion that the man was insane hardly justify his opinion. This was more than forty years ago and the witness did not know but that his peculiarities or insanity was the result of his penuriousness. The mother was eccentric but not insane. The uncle Doran was morose and people feared him, and the half-blood cousin McGuiness was the victim of alcoholism. The most that can be claimed upon the question of heredity is that his relatives lineal, and collateral, were peculiar and eccentric people and not that to any marked degree. With reference to the head injuries it is enough to say that there is no testimony tending to show that any permanent results followed them. One was fifteen years ago and the other some years since, and the petitioner's condition has remained the same since the injuries as previous thereto. One observation may be made in relation to the characteristics and condition of the petitioner, although one witness testified that he grew worse during the last four or five years, the testimony is full and conclusive that in all respects in regard to the petitioner's peculiarities, his eccentricities, his oddities, and in all his departures from the normal type of man, his condition has been the same since childhood, and those that knew him in school-days narrate the same story as those who knew him in later life. One peculiarity about his condition may be noted, that is, before the homicide he never made an assault upon any fellow being, he was not vicious, he was not revengeful. He threatened to finish one Minahane and was running toward him apparently for that purpose but did nothing. With a crowbar over his shoulder he went in search of a man but when he discovered him, did

nothing. He was a good deal of a coward and was regarded, by some of the witnesses at least, as harmless. Testimony showed that when in jail, and subject to the charge of simulating insanity, he assaulted a fellow prisoner, Parker, and also the jailer, Tracy. One expert upon the subject of insanity, a physician, Dr. Page, has testified and given his opinion based upon all the testimony filed in the case, but without any opportunity for an examination of the petitioner; he pronounces him insane, "wholly irresponsible as he was laboring under the delusion of suspicion that he was a persecuted man," that he "had delusions of persecution" and was a "dangerously insane man." This type of insanity is well recognized, a new word has been coined to express it, viz: "persecutory delusions." Dr. Page, the expert, testified that one laboring with this form of insanity is always treacherous—but no witness with possibly one exception, testified that treachery was a characteristic of the petitioner. Many, at least nine, of the witnesses called by the petitioner testified that they did not think at the time they knew him he was insane—never called him so, never heard him called so, did not know he was insane, or, that they were not capable of judging, if he was insane or not; and the prosecution improved fourteen witnesses, workmen with him, employers, the jailer and persons confined with him in jail who expressed their opinion is respect to him and unqualifiedly pronounced him sane. The petitioner was under no delusion in respect to Murphy. He had no fear of him, he said he thought he could lick him—that he was no good—that he had no sand in him—that he would fire him down stairs if he caught him in his room again—that Murphy wanted to beat him—and that he would draw the first blood—was going to Waterbury and wanted to protect himself—and when it was said on the day of the shooting that Murphy was going to get Fox to lick him,

the petitioner said, "I am prepared for him." The testimony
tended to show that he carried his pistol with him all day the
Saturday of the affray, and that when he shot Murphy he
coolly remarked, "I have got you now." Concerning all that
is claimed in respect to the peculiarities and condition of the
respondent and that he was insane in the sense described by Dr.
Page, that he was laboring under "the delusion of suspicion"
had "delusions of persecution," it· is necessary to inquire
whether at the time of the homicide he was under the delusion
of such suspicion or persecution, for, if the homicide was not
the result of his delusion then the fact that at times he was
deluded is no defence to the charge. "That insanity continues
is not a presumption of law but an inference of fact, varying
with the circumstances of the case." *Manley's Ex.* v. *Staples,*
65 Vt. 370. If the petitioner was deluded, at times, in pre-
vious years, there was no presumption that he was so at the
time of the homicide. That fact must be determined, upon all
the testimony showing the circumstances attending the trans-
action, unaided by any presumption that his delusions. con-
tinued. The testimony fails to show that during the week of
the homicide he had any moody or ugly spells, or, was working
without saying anything to anyone, or was complaining of per-
secution of any kind, or that he exhibited any of those charac-
teristics that the witnesses have testified he possessed at times
during his whole life. The murder was committed on Satur-
day. Now what was his condition during the week? The
respondent testified that the first time he had any trouble with
Murphy was the Wednesday night prior to the shooting and
until that time they had been good friends, as good as the pe-
tioner and any one else on the job. One witness testied that
prior to that time they did not speak for a time, the petitioner
said that Murphy had built a staging and that the petitioner
ran against it, but that at about the same time, the petitioner

said that Murphy was a good man on the job and a good workman and it does not appear that any ill feeling between them resulted from this matter.   The Wednesday evening prior to the shooting Murphy went into the petitioner's room for his paper and some words passed between them the next morning in regard to it, the petitioner had threatened to throw or "fire" Murphy down stairs and Murphy said he would like to see him do it and it was reported to Doherty that Murphy said he would "do him up."   While the petitioner testified that it was about the first of the week, we think it was after Wednesday as he himself says he was on good terms with Murphy until Wednesday night.   We make due allowance for the fact that the testimony is that of one claimed to have been, and to be, insane, for if the facts in regard to their relation during that week had been different than as stated by the petitioner it could not but have appeared, for they were at work in connection with the others, most of whom have testified, and no testimony has been given tending to show that there was any ill feeling between them until the paper incident on Wednesday evening. Besides the conversation on Thursday morning in relation to the paper nothing took place between them on that day, but on that day he obtained a rope for the purpose of tying the door to Julia Rock's room, if he found that Murphy went in it, then he said he would call the people of the house.   But on Thursday evening Doherty told Con. Daly that he had learned that Murphy said he would do him up, but that he would draw the first blood, that he was going to Waterbury and that he wanted to protect himself. He did not say what he was going to Waterbury for but his object in going there is apparent.   He did go to Waterbury, purchased the pistol with the cartridges, and tried the pistol on his way home to see if it was effective or could be discharged.   The next day at the noon hour the petitioner went to Murphy when they were at work on the dam

and asked him if he had threatened "to do him." Murphy denied that he had, and then told him, Doherty, that he had heard that the petitioner had threatened "to do" him. The petitioner made no reply but went away. When the workmen were going to the boarding house after work at about half past five the petitioner had conversation with all the parties that were on the way, Daly, McGraw, and McAle; talked concerning his health etc. and when they were near the house in some conversation between them, McAle says that the petitioner said to Murphy "we will go and settle this to-night, Mr. Murphy," or as he words it, says the petitioner said "we will go down and settle this to-night" and that Murphy said "all right." Daly says that as they passed along and were near the house Doherty said "we may as well settle this dispute now as any other time" and that Murphy said "all right" and that Doherty said "come into the barn" and that Murphy replied to that "all right." Mr. Pixley when unharnessing his horse near the barn heard Doherty say "come out here and we will settle this" and that Murphy made the reply stated by the other witnesses; that Doherty then went into the barn making no reply to Pixley's question as to what was the trouble, and then Pixley asking Murphy the same question was answered by him "nothing much." Pixley then said to Murphy "don't go into the barn for you will get hurt." Then Pixley says that he saw Doherty go into the barn, put his hand into his hip pocket, and draw out a revolver and then looked to see if Murphy was going, and as Murphy stopped on account of Pixley's command, Doherty stepped out of the barn and up to Murphy who was nearer the veranda than the barn, and shot him. And no testimony tends to show that the petitioner on his way from the dam or immediately after the shooting was excited, moody, or sullen, and Mr. Pixley says that he did not see that he looked any different than he usually did; that they were near enough

at the time of the shooting to have reached one another with their hands, and Daly says that the petitioner said when he fired "I have got you now," or words to that effect. The petitioner seems to have been aware of the consequences of his act for he said he did it because he was mad and that he was in a scrape. Sent to Mrs. Pixley for his money as soon as he could, and left, going up on the railroad track, and was apprehended near the junction at Montpelier, fifteen miles distant.

In passing upon this question we must to some extent at least, place ourselves in the position of jurors: for it is for us to determine whether upon all the testimony in the case a jury upon another trial would arrive at another result from that expressed by the verdict upon the former trial. We have scanned and thoroughly considered all the testimony in the case and considering the serious nature of the charge and the result to the petitioner, if any doubt has arisen we have solved it in his favor. Upon the whole case we can arrive at no other conclusion than that the verdict upon the trial was correct, and that the result upon another trial would be the same as upon the first. The testimony is voluminous, but none of the salient facts are contradicted, there is no controversy concerning the transaction, nor what took place at the time of the shooting, nor the occurrences for the week before—and during all this time there is nothing that indicates insanity on the part of the petitioner. There is an entire absence of anything to show "delusion of suspicion," the week of the homicide. An absence of any testimony which tends to show insanity so great as to control his will or to take from him the freedom of moral action according to the rule stated in *Com.* v. *Mosher, supra.* At the time of the killing Doherty was under no delusion in respect to Murphy. It is not probable he believed it necessary to kill Murphy in self-defence; there is nothing tending to show that he thought so. There is nothing in the circum-

stances that suggests it. It has been argued before that he feared Murphy and in his fear and terror shot him. His conduct for two days before and at the time of the shooting negatives this. He was, he said, "prepared for him," that he would draw the first blood, he wanted "to protect himself." He was well armed—Murphy was unarmed. He had no fear of Murphy and must have known that an encounter would be fatal to him. All the facts show a deliberate and determined purpose to kill and it cannot be said that he was incompetent to have a criminal intent nor that he was incapable of so controlling his volition as to avoid killing Murphy.

*Upon the whole case the court are of the opinion that the petition ought to be, and the same is, dismissed. A new trial being refused, the court hereby appoints the first Friday in December next in the year 1901 between the hours of one o'clock and three o'clock in the afternoon of said day as the time for executing the sentence heretofore imposed upon said Charles Doherty, and the clerk is directed to issue an order to the sheriff of Windsor county for that purpose.*