[Civil No. 2793.   Filed November 2, 1928.]

[271 Pac. 411.]

PETER H. PORTER and RUDOLPH JOHNSON Plaintiffs, v. MATTIE M. HALL, Individually and as County Recorder of the County of Pinal, State of Arizona, Defendant.

Mr. Edward A. Smith, Special Assistant to the Attorney General of the United States, Mr. John B. Wright, United States District Attorney, and Messrs. Kibbey, Bennett, Gust, Smith & Lyman, for Plaintiffs.

Mr. John W. Murphy, Attorney General of Arizona, Mr. Frank J. Duffy, Assistant Attorney General, Messrs. Cunningham & Carson, and Mr. E. W. McFarland, County Attorney, for Defendant.

LOCKWOOD, J.—Plaintiffs herein filed an original petition in this court for a writ of *mandamus,* directing the county recorder of Pinal county to enter their names on the great register of that county. The petition alleges that they possess all the qualifications, reciting them, of electors as set forth in the Constitution and statutes of Arizona; that they have made the statutory affidavits of registration, but that defendant refuses to enter their names on the proper general and precinct registers of Pinal county.

Defendant answered, admitting her refusal to register the petitioners, but alleging:

"That the plaintiffs . . . are members of the Pima Tribe of Indians, . . . residents of the Gila River Indian Reservation and have never had . . . any residence other than upon . . . the reservation, and have no property except on said reservation, and that the plaintiffs . . . were . . . and are now subject to all the rules and regulations and laws of the United States enacted for the control and regulation of Indian reservations and Indian tribes. . . . That said . . . reservation, the plaintiffs herein, and their property are . . . exclusively subject to and under the jurisdiction of the laws and courts of the United States and the tribal customs of said Pima Tribe, and are not subject to the laws or within the jurisdiction of the state of Arizona. That said . . . reservation while within the geographical boundaries of . . . Arizona is not subject to the laws of the state of Arizona, and is, therefore, not a part of the state of Arizona, either politically or governmentally, . . . and that, therefore, plaintiffs are not residents of the state of Arizona within the meaning of . . . the Constitution of the state of Arizona. . . . That said Pima Tribe and plaintiffs herein, under the laws, rules and regulations of the United States government, are not *sui juris,* and that therefore said Pima Tribe and plaintiffs . . . are under guardianship within the meaning of . . . the Constitution of the state of Arizona."

Plaintiffs replied, admitting their race and residence as alleged in the answer, and that they were under the control of the laws and rules of the United States governing Indian reservations, but denying that they were subject to any Indian tribal customs, or that the reservation was not subject to the laws of Arizona, and alleging that the United States exercises no jurisdiction or control over them or their property, except over certain property held in trust for them. The case was submitted on the pleadings, and a stipulation of facts, the latter being set forth in full as follows:

"It is hereby stipulated by and between plaintiffs and defendant, by their respective attorneys, as follows:

"That the plaintiffs, Peter H. Porter and Rudolph Johnson, are Indians of the Pima Indian Tribe. That they were born upon and have ever since been residents of the Gila River Indian Reservation, and have not now and have never had any residence other than upon said Gila River Indian Reservation, and have no property, except upon said reservation. That they are subject to all of the laws, rules and regulations of the federal government enacted by Congress and by the Department of Indian Affairs in force, regulating said Pima Indians residing and living upon said Gila River Indian Reservation.

"That by act of Congress and Executive Orders, what is now known as the Gila River Indian Reservation, which includes the territory upon which plaintiffs reside, was created and designated as an Indian reservation, which said territory, upon which plaintiffs now reside, was wholly set apart for the Pima Indian Tribe and kindred Indians and has ever since been and is now occupied by said Pima Indians and kindred Indians. That there are not now any inhabitants upon said Indian reservation, other than the Pima Indians and kindred Indians, except the government officials, licensed traders, and persons residing on said reservation by permission of the United States government.

"That under and by virtue of the laws of the United States there is now stationed on the said Gila River Indian Reservation an Indian agent, who is the representative of the government of the United States, and whose duties are prescribed by the laws of the United States and the rules and regulations of the Commissioner of Indian Affairs. That there is maintained upon said Indian reservation a Court of Indian Offenses, existing under and by virtue of the rules and regulations of the Indian Office, the judges of which are Indians and which court has exclusive jurisdiction over all Pima Indians and kindred Indians on said Gila River Indian Reservation, including plaintiffs and their property as provided in said rules and regulations, except in so far as jurisdiction

thereover has been conferred by the government of the United States upon the District Court of the United States and upon the Indian agent. That said Court of Indian Offenses tries civil matters between the said Indians, matters pertaining to domestic relations and minor crimes. That the laws in force upon said reservation, recognized by the said Court and the said Indians, are the laws and regulations of the United States and Indian tribal customs, rules and regulations recognized by the United States government. That there exists upon said Gila River Indian Reservation a tribal council selected by the said Pima Indian Tribe and kindred Indians, which council consults with and assists officers and agents of the United States relative to the welfare of said Indians and their affairs.

"That the offer of plaintiffs' registration was made upon said Gila River Indian Reservation to a deputy registration officer of Pinal county, duly authorized to take and receive registrations in Pinal county.

"It is further stipulated, that the defendant may introduce as evidence, as soon as available, the rules, regulations and orders of the Department of Indian Affairs, existing under authority of the Department of the Interior, regulating and controlling said Gila River Indian Reservation, the Pima Indians and kindred Indians and property located thereon, which shall include the pamphlet known as 'Regulations of the Indian Office' dated April 1st, 1904, the .293 orders, modifying and adding to said regulations, and the various circulars, governing said reservation, and that the same may be received and admitted without objection on the part of the plaintiffs.

"It is further stipulated and agreed, that both the plaintiffs and defendant reserve the right to introduce evidence, should there be any further question arise, caused by the introduction of said rules and regulations."

We were informed on the oral argument by counsel for both parties that there are many other Indians besides plaintiffs whose right to vote at the coming general election will be determined by this case, and we were urgently requested to render our judgment

before November 6th, if possible, so that the election officers of the state might properly perform their duties on that day. For this reason we have advanced the case on the calendar and given it our exclusive and earnest consideration since the filing of the stipulation of facts and briefs.

The facts being undisputed, we have for our consideration two questions: First, is the Gila River Indian Reservation within the political and governmental boundaries of the state of Arizona, so that a residence thereon is residence in the state of Arizona, within the meaning of section 2, article 7, of our Constitution? Second, are persons of Indian race, under the conditions set forth in the stipulation of facts as being those in which plaintiffs find themselves, "under guardianship," within the meaning of the same section?

There are certain constitutional limitations on the right of suffrage in Arizona, which are set forth in section 2, article 7, of our Constitution. This section reads as follows:

"No person shall be entitled to vote at any general election, or for any office that now is, or hereafter may be, elective by the people, or upon any question which may be submitted to a vote of the people, unless such person be a citizen of the United States of the age of twenty-one years or over, and shall have resided in the state one year immediately preceding such election. The word 'citizen' shall include persons of the male and female sex.

"The rights of citizens of the United States to vote and hold office shall not be denied or abridged by the state, or any political division or municipality thereof, on account of sex, and the right to register, to vote and to hold office under any law now in effect, or which may hereafter be enacted, is hereby extended to, and conferred upon males and females alike.

"No person under guardianship, *non compos mentis* or insane, shall be qualified to vote at any election, nor shall any person convicted of treason or

felony, be qualified to vote at any election unless restored to civil rights.''

We consider first the question of residence. It is the contention of defendant that the reservation in question, though geographically in Arizona, is politically and governmentally without it, since it is not subject to the full jurisdiction of our laws. A very similar question was raised in the cases of *Harkness* v. *Hyde,* 98 U. S. 476, 25 L. Ed. 237, and *Langford* v. *Monteith,* 102 U. S. 145, 26 L. Ed. 53. We quote from these cases as follows:

''The Act of Congress of March 3, 1863, organizing the territory of Idaho, provides that it shall not embrace within its limits or jurisdiction any territory of an Indian Tribe without the latter's assent, but that 'all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Idaho,' until the Tribe shall signify its assent to the President to be included within the territory. 12 Stat. at L. 808.

''On the 3d of July, 1868, 15 Stat. at L. 674, a treaty with the Shoshonee Indians was ratified. . . . No assent was given by this Treaty that the territory constituting the reservation should be brought under the jurisdiction or be included within the limits of Idaho. Any implication even of such an assent is negatived by the terms in which the reservation is made, and it is not pretended that any such assent has been signified to the President. The territory reserved, therefore, was as much beyond the jurisdiction, legislative or judicial, of the government of Idaho, as if it had been set apart within the limits of another country or of a foreign state. Its lines marked the bounds of that government. The process of one of its courts, consequently, served beyond those lines, could not impose upon the defendant any obligation of obedience, and its disregard could not entail upon him any penalties. The service was an unlawful act of the sheriff.'' *Harkness* v. *Hyde, supra.*

''And the opinion of this court at the last term, in the case of *Harkness* v. *Hyde,* 98 U. S. 476 [25 L. Ed. 237], . . . is relied on by defendant's counsel.

"The principle announced in that case, namely: that when, by the act of Congress which organizes a new territorial or state government, any part of the land within the limits of its exterior boundaries is excepted out of the jurisdiction of the government thus brought into existence, it is no part of such state or territory, is sound. The authority of Congress, from which the power to exercise the new jurisdiction proceeds, to except from that jurisdiction any part of its own soil, or that of the Indians, to whom the government has promised by solemn treaties to do so, is beyond question. . . .

"And this court in the case of *Harkness* v. *Hyde,* relying upon an imperfect extract from a treaty with the Shoshonees found in the brief of counsel, inadvertently inferred that it contained a clause against including the lands of the tribe within a territorial or state jurisdiction like the treaty with the Shawnees. In this it seems we were laboring under a mistake, and where no such clause or language equivalent to it is found in a treaty with any Indian tribe within the exterior limits of Idaho, the land held by them is a part of the territory and subject to its jurisdiction, so that process may run there, however the Indians themselves may be exempt from that jurisdiction. As we are not shown any such treaty with the Nez Perce Tribe, on whose lands the premises in dispute are situated; and as it is a contest between white men, citizens of the United States, the court had jurisdiction of the parties, if the subject-matter was one of which the justice of the peace could take cognizance." *Langford* v. *Monteith, supra.*

And in the case of *United States* v. *McBratney,* 104 U. S. 621, 26 L. Ed. 869, the court said:

"Whenever, upon the admission of a state into the Union, Congress has intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words."

It is claimed, however, by defendant, that Congress did make an express exception in the Enabling Act for Arizona, and the following language in that act

is relied on as bringing all Indian reservations in
Arizona within the principle of *Harkness* v. *Hyde,*
and *Langford* v. *Monteith, supra.*

"That the people inhabiting said proposed state do
agree and declare that they forever disclaim all right
and title to . . . all lands lying within said boundaries
owned or held by any Indian or Indian tribes . . .
and that until the title of such Indian or Indian tribe
shall have been extinguished the same shall be and
remain subject to the disposition and under the abso-
lute jurisdiction and control of the Congress of the
United States. . . . "

Almost the exact language of our Enabling Act
appears in the Enabling Act of the state of Montana,
and it was construed in the case of *Draper* v. *United
States,* 164 U. S. 240, 41 L. Ed. 419, 17 Sup. Ct. Rep.
107. We quote therefrom:

"In *United States* v. *McBratney,* 104 U. S. 622 [26
L. Ed. 869], . . . this court held that where a state
was admitted into the Union, and the Enabling Act
contained no exclusion of jurisdiction as to crimes
committed on an Indian reservation by others than
Indians or against Indians, the state courts were
vested with jurisdiction to try and punish such
crimes. The court there said:

" 'The Act of March 3, 1875 (the Enabling Act
which provided for the admission of the state of Colo-
rado), necessarily repeals the provisions of any prior
statute, or of any existing treaty, which are clearly
inconsistent therewith. *207½ lb. Papers S. Tobacco*
v. *United States ("The Cherokee Tobacco")* 78 U. S.
(11 Wall.) 616 [20 L. Ed. 227]. . . . Whenever, upon
the admission of a state into the Union, Congress has
intended to except out of it an Indian reservation, or
the sole and exclusive jurisdiction over that reserva-
tion, it has done so by express words. *Blue Jacket*
v. *Johnson County Com'rs. ("The Kansas Indians")*
72 U. S. (5 Wall.) 737 [18 L. Ed. 667]; . . . *United
States* v. *Ward* [Fed. Cas. No 16,639], Woolw. 17.
. . . '

"*United States* v. *McBratney* is therefore decisive of the question now before us, unless the Enabling Act of the state of Montana contained provisions taking that state out of the general rule and depriving its courts of the jurisdiction to them belonging and resulting from the very nature of the equality conferred on the state by virtue of its admission into the Union. Such exception is sought here to be evolved from certain provisions of the Enabling Act of Montana which were ratified by an ordinance of the convention which framed the Constitution of that state. The provision relied on is as follows:

"Second. That the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. . . . '

"The words in the foregoing provisions upon which the argument is based are the following: 'And said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.' This language has been considered in several cases in the courts of the United States with somewhat contradictory results. *United States* v. *Ewing* [D. C.] 47 Fed. 809; *United States* v. *Partello* [C. C.] 48 Fed. 670; *Truscott* v. *Hurlbut Land & C. Co.* [C. C. A.] 73 Fed. 61.

"As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of 'Indian lands' does not of necessity signify a retention of jurisdiction in the United States to punish all offenses committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language

relied on is found disclaims all right and title of the state to 'the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the disposition of the United States.' Therefore the subsequent words, 'and said lands shall remain under the absolute jurisdiction and control of the United States,' are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks not only the particular action of Congress as to the Crow Reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of Montana into the Union. . . .

"Indeed, if the meaning of the words which reserved jurisdiction and control over Indian lands contended for by the defendant in error were true, then the state of Montana would not only be deprived of authority to punish offenses committed by her own citizens upon Indian reservations, but would also have like want of authority for all offenses committed by her own citizens upon such portions of the public domain within her borders as may have been appropriated and patented to an Indian under the terms of the act of 1887. The conclusion to which the contention leads is an efficient demonstration of its fallacy. It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the Enabling Act by which the state of Montana was admitted into the Union adequately explains the use of the words relied upon, and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive that state of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the Enabling Act becomes meaningless unless it be construed as depriv-

ing the state of authority belonging in virtue of its existence as an equal member of the Union."

The first three cases cited were reviewed by our court in *Territory v. Delinquent Tax List,* 3 Ariz. 302, 26 Pac. 310, and the court said, referring to the same reservation involved in this case:

"In the absence of treaty or other express exclusion, the reservation becomes a part of the territory, subject, however, to the power of the general government to make regulations respecting the Indians, etc. There is nothing to show, nor does the court know judicially or otherwise, that there ever was any treaty between the government and the Indian tribe or tribes on the reservation."

We have no hesitancy in holding, therefore, that all Indian reservations in Arizona are within the political and governmental, as well as geographical boundaries of the state, and that the exception set forth in our Enabling Act applies to the Indian lands considered as property, and not as a territorial area withdrawn from the sovereignty of the state of Arizona. Plaintiffs, therefore, under the stipulation of facts, are residents of the state of Arizona, within the meaning of section 2, article 7, *supra.*

Are they "under guardianship," within the meaning of the same section? In determining this question there are two of the canons of constitutional construction which seem peculiarly applicable. The first and most important one is that the construction should be such as to accomplish the apparent purpose of the provision. *Laird v. Sims,* 16 Ariz. 521, L. R. A. 1915F 519, 147 Pac. 738; *Clark v. Boyce,* 20 Ariz. 544, 185 Pac. 136. The second is that some meaning should, if possible, be given to each phrase construed. *Gates v. Salmon,* 35 Cal. 576, 95 Am. Dec. 139; *Trapp v. Wells-Fargo Express Co.,* 22 Okl. 377, 97 Pac. 1003.

Let us consider the canon first set forth above. The theory on which democracy is founded is that

every person who is bound to obey the laws should participate in making them, and, conversely, that every person who is bound to obey the laws should be subject to their jurisdiction. Nowhere, however, has the franchise been extended in literal conformity with the first proposition. The practical working method has been that every democracy has set up certain standards, financial, physical, mental and moral, and required that all persons who desired to participate in the government should satisfy these standards. Sometimes the discrimination was based on property, sometimes on race or nationality, sometimes on sex or social position, but always it has existed in some form. The second proposition that all who participate in making the laws shall be subject to their jurisdiction, has been far more literally followed. It is almost unheard of in a democracy that those who make the laws need not obey them. As is well said in *Opsahl* v. *Johnson,* 138 Minn. 42, 163 N. W. 988:

"But there are other cogent reasons urged by contestant against holding mixed bloods living on Indian reservations entitled to vote. The exercise of the elective franchise is a participation in government and in the making of the laws to which all the inhabitants of a nation, state, or municipality must yield obedience. It cannot for a moment be considered that the framers of the Constitution intended to grant the right of suffrage to persons who were under no obligation to obey the laws enacted as a result of such grant. Or, in other words, that those who do not come within the operation of the laws of the state, nevertheless shall have the power to make and impose laws upon others. The idea is repugnant to our form of government. No one should participate in the making of laws which he need not obey."

Even in the first case, the tendency among the more modern democracies has been to lessen the number of excluded classes. In America disqualification

on account of race and sex has been abolished by the federal Constitution, and exclusion from suffrage on account of property is rapidly disappearing in all the states. In Arizona but five classes of constitutional limitations on the suffrage remain. The first is one of nationality—the voter must be a citizen; the second refers to age—he must be over 21; the third considers residence—one year in the state is required; the fifth embraces convicted criminals. The fourth limitation on its face covers "persons under guardianship, *non compos mentis,* and insane." Presumably this refers to three separate classes, for we must assume under the second canon of construction above referred to that the makers of the Constitution did not use three different phrases to mean the same thing. On the other hand, under the maxim *"noscitur a sociis,"* they must be considered to have some common quality or relationship. *Carson* v. *Shelton,* 128 Ky. 248, 15 L. R. A. (N. S.) 509, 107 S. W. 793; 29 Cyc. 1065, and cases cited.

Insanity is a broad, comprehensive, and general term, of ambiguous import, for all unsound and deranged conditions of the mind. *Gunter* v. *State,* 83 Ala. 96, 3 South. 600. However, legally speaking, insanity is generally regarded as such unsoundness of mental condition as nullifies or does away with individual legal responsibility or capacity. *Doherty* v. *State,* 73 Vt. 380, 50 Atl. 1113. *"Non compos mentis"* was originally a phrase which was considered practically synonymous with insanity, but under the influence of modern thought the words are now generally construed to intend the subject's mental inability to manage himself and his ordinary affairs, from whatever cause, as distinct from ordinary insanity, such inability may arise. *In re Streiff,* 119 Wis. 566, 100 Am. St. Rep. 903, 97 N. W. 189.

Broadly speaking, persons under guardianship may be defined as those who, because of some peculiarity

of status, defect of age, understanding, or self-control, are considered incapable of managing their own affairs, and who therefore have some other person lawfully invested with the power and charged with the duty of taking care of their persons or managing their property, or both. It will be seen from the foregoing definitions that there is one common quality found in each: The person falling within any of the classes is to some extent and for some reason considered by the law as incapable of managing his own affairs as a normal person, and needing some special care from the state. To put it in a word, he is not *sui juris*. It is apparent to us that it was the purpose of our Constitution, by these three phrases, to disfranchise all persons not *sui juris,* no matter what the cause, and its justice is plain. The man who for any reason is exempt from responsibility to the law for his acts, who cannot be trusted to manage his own person or property, certainly as a matter of common sense cannot be trusted to make laws for the government of others, and placing him under the guardianship of another conclusively establishes that incapacity. We hold, therefore, that any person who, by reason of personal inherent status, age, mental deficiency, or education, or lack of self-control, is deemed by the law to be incapable of handling his own affairs in the ordinary manner, and is therefore placed by that law under the control of a person or agency which has the right to regulate his actions or relations towards others in a manner differing from that by which the actions and relations of the ordinary citizen may be regulated, is a ''person under guardianship,'' within the meaning of section 2, article 7, of the Constitution.

Do plaintiffs fall within this category? It is the undisputed law, laid down by the Supreme Court of the United States innumerable times, from the famous case of *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 8 L. Ed.

25, to the present time, that all Indians are wards of the federal government, and as such are entitled to the care and protection due from a guardian to his ward. *La Motte* v. *United States,* 254 U. S. 570, 65 L. Ed. 410, 41 Sup. Ct. Rep. 204; *Williams* v. *Johnson,* 239 U. S. 414, 60 L. Ed. 358, 36 Sup. Ct. Rep. 150; *United States* v. *Kagama,* 118 U. S. 375, 30 L. Ed. 228, 6 Sup. Ct. Rep. 1109; *United States* v. *Osage Co.,* 251 U. S. 128, 64 L. Ed. 184, 40 Sup. Ct. Rep. 100; *Jones* v. *Meehan,* 175 U. S. 1, 44 L. Ed. 49, 20 Sup. Ct. Rep. 1; *United States ex rel. West* v. *Hitchcock,* 205 U. S. 80, 51 L. Ed. 719, 27 Sup. Ct. Rep. 423.

That this guardianship was founded on the idea that the Indians were not capable of handling their own affairs in competition with the whites, if left free to do so, is shown by the following quotations from the cases cited above:

"Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father." *Cherokee Nation* v. *Georgia, supra.*

"It seems to us that this is within the competency of Congress. These Indian Tribes *are* the wards of the nation. They are communities *dependent on the* United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court whenever the question has arisen." *United States* v. *Kagama, supra.*

"The Indian tribes within the limits of the United States are not foreign nations; though distinct political communities, they are in a dependent condition; and Chief Justice Marshall's description, that 'they are in a state of pupilage,' and 'their relation to the United States resembles that of a ward to his guardian,' has become more and more appropriate as they have grown less powerful and more dependent. . . . The Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression. . . . " *Jones* v. *Meehan, supra.*

"We should hesitate a good deal, especially in view of the long-established practice of the department, before saying that this language was not broad enough to warrant a regulation obviously made for the welfare of the rather helpless people concerned. The power of Congress is not doubted. The Indians have been treated as wards of the Nation. Some such supervision was necessary, and has been exercised." *United States ex rel. West* v. *Hitchcock, supra.*

"Certain is it that as the United States, as guardian of the Indians, had the duty to protect them from spoliation. . . . This necessarily follows because, in the first place, as the authority of the United States extended to all the noncompetent members of the tribe, it obviously resulted that the interposition of a court of equity to prevent the wrong complained of was essential in order to avoid a multiplicity of suits. . . . In the second place, because, as the wrong relied upon was not a mere mistake or error committed in the enforcement of the state tax laws, but a systematic and intentional disregard of such laws by the state officers for the purpose of destroying the rights of the whole class of noncompetent Indians who were subject to the protection of the United States. . . . " *United States* v. *Osage County, supra.*

"The Osages have not been fully emancipated, but are still wards of the United States. The restrictions on the disposal and leasing of their allotments constitute an important part of the plan whereby they are being conducted from a state of tribal dependence to one of individual independence and responsibility;

and outsiders, such as the defendants, are bound to respect the restrictions quite as much as are the allottees and their heirs. Authority to enforce them, like the power to impose them, is an incident of the guardianship of the United States." *La Motte* v. *United States, supra.*

They owe no allegience to the states and receive no protection from them. *United States* v. *Kagama, supra; In re Lelah-puc-ka-chee,* (D. C.) 98 Fed. 429; *People* v. *Daly,* 212 N. Y. 183, Ann. Cas. 1915D 367, 105 N. E. 1048.

The Indians themselves cannot suspend that relation without the consent of the government, and it is for Congress alone to say when and how such relationship shall be terminated. *Elk* v. *Wilkins,* 112 U. S. 94, 28 L. Ed. 643, 5 Sup. Ct. Rep. 41.

Nor is such guardianship terminated by the Indians becoming citizens of the United States or the state in which they live. *Winton* v. *Amos,* 255 U. S. 373, 65 L. Ed. 684, 41 Sup. Ct. Rep. 342; *United States* v. *Waller,* 243 U. S. 452, 61 L. Ed. 843, 37 Sup. Ct. Rep. 430; *United States* v. *Sandoval,* 231 U. S. 28, 58 L. Ed. 107, 34 Sup. Ct. Rep. 1. In the case of *Winton* v. *Amos, supra,* the court said:

"It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it." *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 47 L. Ed. 299, 23 Sup. Ct. Rep. 216; *Tiger* v. *Western Inv. Co.,* 221 U. S. 286, 55 L. Ed. 738, 31 Sup. Ct. Rep. 578.

How, then, if at all, may this guardianship be terminated? The question is fully discussed in the case of *In re Heff,* 197 U. S. 489, 49 L. Ed. 848, 25 Sup. Ct. Rep. 507, as follows:

"In a general way it may be said that the recognized relation between the government and the Indians is that of a superior and an inferior, whereby the latter is placed under the care and control of the former. *Choctaw Nation* v. *United States*, 119 U. S. 1, 28, 30 L. Ed. 306, 315, 7 Sup. Ct. 75. . . . Much of the legislation of Congress ran in the direction of the isolation of the Indians, preventing general intercourse between them and their white neighbors in order that they might not be defrauded or wronged through the superior cunning and skill of those neighbors. . . .

"While, during these years, the exercise of certain powers by the Indian tribes was recognized, yet their subjection to the full control of the United States was often affirmed. In *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565, 47 L. Ed. 299, 306, 23 Sup. Ct. 216, it was said: 'Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government.' . . .

"Of late years a new policy has found expression in the legislation of Congress, a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one *sui juris*. And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation; but when that purpose is made clear the question is at an end. . . . 'It would seem that Congress intended citizenship of the United States to attach

at the same time that the Indian becomes subject to the laws of the state or territory in which he resides. . . . ,

"We are of the opinion that, when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of, and requires him to be subject to, the laws, both civil and criminal, of the state, it places him outside the reach of police regulations on the part of Congress; that the emancipation from federal control, thus created, cannot be set aside at the instance of the government without the consent of the individual Indian and the state, and that this emancipation from federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and incumbrance, or the further fact that it guarantees to him an interest in tribal or other property."

Adopting the rule laid down in that case to be used in determining when the guardianship unquestionably exercised over all Indians within the United States until such guardianship is determined by act of the federal government ceases, let us apply it to the facts stipulated herein.

Plaintiffs have always resided on the Gila River Indian Reservation, and are subject to all the laws, rules, and regulations of the federal government, enacted by Congress and by the Department of Indian Affairs, regulating the Pima Indians living on said reservation, and subject to the jurisdiction of a special Court of Indian Offenses, created by the rules of the said department, except so far as the law confers jurisdiction of the federal district court. This court, of course, takes judicial notice of the federal statutes. These statutes provide that Indians of the class to which plaintiffs belong, in case they commit a crime while on such reservation, are subject, not to the laws of the state of Arizona, but to the laws of the United States, and their own customs. Title 25, §§ 217, 218, U. S. Code Ann. (R. S. U. S., pars. 2145,

2146); title 18, § 548, U. S. Code Ann. (Act March 3, 1885).

And this is based on the fact that *they are wards of the United States,* and not that they are without the territorial jurisdiction of the state. *United States* v. *Kagama, supra; Donnelly* v. *United States,* 228 U. S. 243, 57 L. Ed. 820–832, 33 Sup. Ct. Rep. 449, Ann. Cas. 1913E 710. As was said in the Donnelly case, *supra,* discussing the federal jurisdiction over Indians after the admission as a state:

"This was in effect held, as to crimes committed *by* the Indians, in the Kagama Case, 118 U. S. 375, 383, 30 L. Ed. 228, 231, 6 Sup. Ct. 1109, where the constitutionality of the second branch of section 9 of the Act of March 3, 1885 (23 Stat. at L. 385, chap. 341 [18 U. S. C. A., § 548]), was sustained *upon the ground that the Indian tribes are the wards of the nation.*" (Italics ours.)

We need go no further to determine that plaintiffs have not been emancipated from their guardianship, and to some extent, at least, are not subject to the laws of the state of Arizona, in the same manner as are ordinary citizens. Counsel have cited to us the case of *Swift* v. *Leach,* 45 N. D. 437, 178 N. W. 437, as supporting their theory that the phrase "persons under guardianship" does not apply to plaintiffs. In that case the court did say:

"The provisions of our Constitution relied upon by the appellant, which provide that no person who is under guardianship, *non compos mentis,* or insane shall be qualified to vote at any election . . . has no application to this federal status of the Indian. If it did have application, it would serve to disqualify the Indian from voting by reason of the status, whether he was a citizen of the United States, or a civilized person of Indian descent who has severed his tribal relation, under the constitutional provision . . . hereinbefore quoted."

The Constitution of North Dakota expressly extended the right of suffrage to "civilized persons of Indian descent who shall have severed their tribal relations two years next preceding such election." Section 121, subd. 3. And the court apparently thought such provision negatived the idea that the phrase "persons under guardianship" referred to Indians. It would seem to us that the Indians granted suffrage by the Dakota Constitution had been fully emancipated under the decision of *Re Heff, supra*. If so, they of course were no longer under guardianship. But if the court meant that Indians still unemancipated and under the control of the federal government, as plaintiffs are in this case, were not "under guardianship," for the reasons set forth hereinbefore we decline to agree with such a conclusion.

We heartily approve of the present announced policy of the federal government that, so soon as its Indian wards are fitted therefor, they should be released from their guardianship and placed in the ranks of citizens of the United States and of the state of their residence, as *sui juris*, subject to all the responsibilities and entitled to all the privileges of such status. Whenever that government shall determine in regard to any Indian or class of Indians that they are so released, and that their status in regard to the responsibilities of citizenship is the same as that of any other citizen, the law of this state considers them no longer "persons under guardianship" within the meaning of section 2, article 7, of our Constitution, and they will be entitled to vote on the same terms as all other citizens. But so long as the federal government insists that, notwithstanding their citizenship, their responsibility under our law differs from that of the ordinary citizen, and that they are, or may be, regulated by that government, by virtue

of its guardianship, in any manner different from that which may be used in the regulation of white citizens, they are, within the meaning of our constitutional provision, "persons under guardianship," and not entitled to vote.

McALISTER, J., concurs.

ROSS, C. J.—I dissent, and my reason for so doing is that the Indians here seeking the right to vote, as well as all other Indians born in the United States, are expressly declared by Act of Congress of June 2, 1924 (U. S. Comp. Stats., Supplement 1925, § 3951aa), to be citizens of the United States. Previous acts of Congress had conferred this status on only certain individuals or classes of Indians, but this last act was general and all-inclusive. Being citizens of the United States and admittedly possessing all the qualifications provided for by our Constitution and laws, as to residence, education, etc., they are entitled to be registered as voters, and to vote, unless they fall within the exceptions of the Constitution and laws worded as follows:

"No person under guardianship, *non compos mentis*, or insane, shall be qualified to vote at any election . . . " Section 2, art. 7, Constitution.

Or, as it reads in the election laws:

"Idiots, insane persons, and persons *non compos mentis* or under guardianship." Paragraph 2879, Civil Code 1913.

The prevailing opinion holds that these Indians are under guardianship of the United States, and therefore not entitled to be registered nor to vote. It is true that the decisions of the courts, both federal and state, beginning with *Cherokee* v. *Georgia*, 5 Pet. 1, 8 L. Ed. 25, in which the opinion was written by the great Chief Justice MARSHALL, have described the

status of the Indian as that of a ward of the United States. In that case it was said:

"Their relation to the United States resembles that of a ward to his guardian."

And this expression, and this form of expression, has been uniformly employed by the courts since then in discussing the status of the Indian. It is not a guardianship, but, as MARSHALL said, it "resembles" a guardianship. The status of guardianship disqualifying one to vote, in my opinion, is one arising under the laws providing for the establishment of that status after a hearing in court. It is not a status that "resembles" guardianship, but legal guardianship, authorized by law.

The Constitution of North Dakota contains the same provisions as ours, and in the case of *Swift* v. *Leach*, 45 N. D. 437, 178 N. W. 437, the same contention was made as is made here. The court said:

"The provisions of our Constitution relied upon by the appellant, which provide that no person who is under guardianship, *non compos mentis,* or insane shall be qualified to vote at any election (section 127), has no application to this federal status of the Indian."

This is only a bare statement, unsupported by any reasoning or authority, but some propositions are so plain as to need no amplification, and I am of the opinion that this is the situation here.

It may be that these plaintiffs, and others in their situation, should not, as a matter of public policy, be granted the franchise, since they are not entirely emancipated from federal control, nor amenable while on the reservation to the state laws; but as the laws are now written it seems to me they are entitled to register and to vote.