541 P.2d 955

**Edmund FRANCISCO, Petitioner,**

**v.**

**The STATE of Arizona, the Honorable J. Richard Hannah, Judge of the Pima County Superior Court, and the Pima County Superior Court, Respondents.**

**No. 2 CA–CIV 1969.**

Court of Appeals of Arizona,
Division 2.

Oct. 28, 1975.

Rehearing Denied Dec. 18, 1975.

Review Granted Jan. 20, 1976.

Papago Legal Services by James J. Purcell, Sells, for petitioner.

Dennis DeConcini, Pima County Atty. by David R. Ostapuk, Deputy County Atty., Tucson, for respondents.

OPINION

HOWARD, Chief Judge.

We are asked in this special action proceeding to determine whether the respondent court abused its discretion in denying petitioner's motion to dismiss an action brought against him by the State of Arizona in the name of Veronica Toro to determine petitioner's alleged paternity of Veronica's child, Johnathan. He claimed lack of jurisdiction over his person on the ground that the Pima County deputy sheriff who served him was without authority within the exterior boundaries of the Papago Indian Reservation.

Petitioner and the mother of the child are Papago Indians. The conception is alleged to have occurred off the reservation. The child was born at Tucson Medical Center in Tucson. The mother and child have resided in Tucson since his birth. Petitioner resides, and process was served, within the exterior boundaries of the Papago Indian Reservation.

The issue is whether exertion by the respondent court of in personam jurisdiction over the petitioner was proper. This is an appropriate case for considering relief by way of special action since petitioner ought not to be put to the expense of litigating the matter if the court is indeed without jurisdiction. See *Magidow v. Coronado Cattle Company*, 19 Ariz.App. 38, 41, 504 P.2d 961 (1972).

Petitioner's general contention is that the State of Arizona, by way of Article XX Paragraph Fourth of its Constitution, passed in compliance with Arizona's Enabling Act, 36 Stat. 557, 569, ceded all of its interest, both governmental and proprietary, in reservation land to the United States as trustee for the various Indian tribes. It therefore follows, he contends, that jurisdiction of the superior court over Indians ends at the exterior boundaries of the reservation. He cites *Martin v. Denver Juvenile Court*, 177 Colo. 261, 493 P.2d 1093 (1972) as authority for this contention.

While *Martin* held that a South Dakota deputy sheriff was without authority to serve process on an Oglala Sioux Indian within the exterior boundaries of the Pine Ridge Indian Reservation, it reached this conclusion by applying South Dakota law interpreting its constitutional adaptation of its Enabling Act differently than Arizona's interpretation of its Enabling Act. See *Smith v. Temple*, 82 S.D. 650, 152 N.W.2d 547 (1967). Two other jurisdictions have held that service of process by a deputy sheriff upon an Indian on the reservation was proper. See *State Securities Inc. v. Anderson*, 84 N.M. 629, 506 P.2d 786 (1973) and *Bad Horse v. Bad Horse*, 163 Mont. 445, 517 P.2d 893 (1974), cert. denied, 419 U.S. 847, 93 S.Ct. 83, 42 L.Ed.2d 76 (1974).

Arizona's Enabling Act was interpreted by our Supreme Court in *Porter v. Hall*, 34 Ariz. 308, 271 P. 411 (1928), a case involving the Pinal County Recorder's refusal to enter the names of the Pima Indian plaintiffs on the great register of Pinal County on the ground that they were not residents of the State of Arizona. Though it was not until 1948 that the Indians of Arizona were recognized as entitled to the franchise, *Porter* recognized their Arizona residency, rejecting the Recorder's contention that the Pima Indian Reservation was politically and governmentally outside the jurisdiction of the state. After discussing the cases of *Harkness v. Hyde*, 98 U.S. 476, 25 L.Ed. 237 (1879) and *Langford v. Monteith*, 102 U.S. 145, 26 L.Ed. 53 (1880), the Arizona Supreme Court stated:

"We have no hesitancy in holding, therefore, that all Indian reservations in Arizona are within the political and governmental, as well as geographical boundaries of the state, and that the exception set forth in our Enabling Act ap-

plies to the Indian lands considered as property, and not as a territorial area withdrawn from the sovereignty of the state of Arizona." 34 Ariz. at 321, 271 P. at 415.

The case of *Harkness v. Hyde,* supra, held that the Shoshonee Indian Reservation was "beyond the jurisdiction, legislative or judicial, of the Government of Idaho, as if it had been set apart within the limits of another country or of a foreign state," and therefore that "[t]he process of one of its courts, consequently, served beyond those lines, could not impose upon the defendant any obligation of obedience, and its disregard could not entail upon him any penalties." 25 L.Ed. at 237. Service by the county sheriff upon the defendant at his place of residence on the reservation was therefore held to be an "unlawful act" which gave the Idaho courts no personal jurisdiction over the defendant.

In *Langford v. Monteith,* supra, the United States Supreme Court qualified its position in *Hyde* by stating that it relied in the case upon an imperfect extract from the Treaty with the Shoshonees found in the brief of counsel which led the Court to believe that the Shoshonee Treaty contained a clause similar to one in the Treaty with the Shawnees guaranteeing that the lands of the Tribe should never be brought within the bounds of any state or territory or subject to the laws thereof. The Court subsequently found that no such clause was contained in the treaties with any Indian Tribe within the exterior boundaries of Idaho and held that in the absence of such a clause, the Idaho Enabling Act did not remove Idaho's jurisdiction from lands held by those tribes and that "process may run there, however the Indians themselves may be exempt from that jurisdiction." 26 L.Ed. at 54.

The issue of the validity of service of process upon an Indian by a deputy sheriff within the boundaries of a reservation was first raised in Arizona in the case of *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624 (1950). That case dealt with a divorce action between two Navajos which was begun in tribal court. After the decree was granted to the husband, the wife brought a second divorce action in the state court. Summons was served upon the husband on the reservation. He did not appear to answer and a second decree was rendered in favor of the wife ordering the husband to pay support and maintenance. He ignored the superior court decree and the wife filed an affidavit charging contempt. After a hearing, the husband was found to be in contempt of the Arizona decree. He was arrested on the reservation by the Sheriff of Apache County and incarcerated in the county jail. The Arizona Supreme Court granted his application for a writ of habeas corpus and held that the superior court lacked subject matter jurisdiction to enter the second decree for the reason that the tribal decree was conclusive. Since the decree forming the basis of the contempt order was a nullity, the petitioner was entitled to his release and the issue of the validity of service of process was not reached.

The next time the issue was raised was in *Williams v. Lee,* 83 Ariz. 241, 319 P.2d 998 (1958). In that case the plaintiffs were operating a trading post on the Navajo Reservation. They sold certain articles to the Navajo defendants on credit, and when the balance was not paid, they brought suit in superior court. Process was served and a writ of attachment issued by the Sheriff. The Arizona Supreme Court held the service of process valid, but held the writ of attachment invalid for the reason that federal and tribal interests pre-empted that of the state and the superior court was therefore without subject matter jurisdiction to issue the writ. The United States Supreme Court in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed. 2d 251 (1959) reversed the Arizona Supreme Court on the ground that the superior court not only lacked jurisdiction to issue the writ, but lacked subject matter ju-

risdiction over the entire controversy, holding that "to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." 358 U.S. at 223, 79 S.Ct. at 272. This decision, as well as the Arizona Supreme Court decision in *Begay*, was based on the issue of lack of subject matter jurisdiction, leaving the issue of the validity of service unresolved.

■ We are inclined in the case at bench to follow the language of the Arizona Supreme Court in the *Williams* case which appears at 83 Ariz. 244, 319 P.2d 1000:

"Our view is that if the subject matter of the litigation is one that the state court has jurisdiction to try and determine and the federal government has not reserve sole and exclusive jurisdiction over the territory involved, the state officers may enter such territory under the state's sovereign authority and serve the necessary process to enable it to exercise its legitimate jurisdiction."

We believe this statement still to be the law in Arizona, not having specifically been addressed by the United States Supreme Court. We note however, that an examination of the recent case of *McClanahan v. State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) is appropriate here, for the decision does much to restrict former Arizona interpretations of our Enabling Act.

Division One of this court decided *McClanahan v. State Tax Commission*, 14 Ariz.App. 452, 484 P.2d 221 (1971) (review denied by the Arizona Supreme Court) by attempting to follow the United States Supreme Court opinion in *Williams*. The issue in the case was the ability of the State Tax Commission to tax a Navajo Indian's income earned wholly within the boundaries of the Reservation. Division One reasoned that the imposition of such a tax did not infringe upon the tribal right of self-

government and therefore that "such a tax is a valid exercise of state law within the confines of the Indian reservation." 14 Ariz.App. at 457, 484 P.2d at 226. The United States Supreme Court reversed, again on the ground that the state court lacked subject matter jurisdiction over Indians engaged in activities solely within the boundaries of the reservation. In reaching its conclusion, the Court re-examined the applicability of the state's Enabling Act, and the treaty between the Navajo Tribe and the United States, to Arizona's ability to extend its laws beyond the borders of Indian reservations. The trend, said the Court, "has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption," as is found by an examination of "the applicable treaties and statutes which define the limits of state power." 411 U.S. at 172, 93 S.Ct. at 1262.

No treaty between the Papago Tribe and the United States exists. The land presently occupied by the Tribe was set aside by Executive Order No. 2524 signed by President Wilson on February 1, 1917 containing the following language:

"Executive orders, dated June 16, 1911, December 5, 1912, and January 14, 1916, withdrawing certain lands in Arizona for the benefit of the Papago Indians be, and the same hereby are, revoked, and, exclusive of a tribal right to the minerals therein contained, all surveyed land . . . be, and the same hereby are, withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona: * * *" [a description of the lands reserved follows] Kappler, Indian Affairs—Laws and Treaties, Vol. 4, p. 1005 (1927).

It is thus evident that no specific guarantees with regard to the exertion of state jurisdiction over the land to be occupied by the Tribe were made. This fact, however, is not conclusive of the issue before us, for the treaty between the Navajo Tribe and

the United States, which was similarly silent on the subject of such a guarantee, was interpreted in *McClanahan* in such fashion as to imply the very guarantee which was conspicuously absent. In arriving at such an interpretation, the United States Supreme Court applied a rule of construction, the substance of which is, that " '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " 411 U.S. at 174, 93 S.Ct. at 1263 citing *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 174 L.Ed. 478 (1930). The Court then concluded:

". . . it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus unsurprising that this Court has interpreted the Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation." 411 U.S. at 174–175, 93 S.Ct. at 1263.

█ The distinction between a reservation created by treaty such as that of the Navajos, and one created by Executive Order such as that of the Papagos has little relevancy to the issue involved here. See generally, U. S. Department of the Interior, Federal Indian Law, Ch. IX, Sub. Ch. A, Sec. 7 (1958) (hereinafter referred to as Federal Indian Law). The fact is that the Papago Reservation was set aside for the use and occupancy of the Papago Indians and the Executive Order setting it aside is subject to the same rule of construction as that applied by the United States Supreme Court to the Navajo Treaty.

Assuming then that the state's ability to extend its reach beyond the borders of the Papago Reservation is subject to the same restrictions as those applicable to its extending its reach beyond the borders of the Navajo Reservation, must *McClanahan* be read as overruling *Langford* sub silentio? We think not. *McClanahan* indeed does much to restrict the *Porter* interpretation of Arizona's Enabling Act by holding that in attempting to impose a tax on the income of a Navajo, Arizona was "totally lacking in jurisdiction over both the people and the lands it [sought] to tax." 411 U. S. at 181, 93 S.Ct. at 1267. We doubt, however, that the Court intended to promulgate a rule immunizing Indians from the reach of the state's process when the subject matter of the controversy arises outside the reservation boundaries. See Federal Indian Law, supra at p. 363:

"In matters not affecting either the Federal Government or the tribal relations, an Indian has the same status to sue and be sued in State courts as any other citizen."

The Court in *McClanahan* stated it was not then dealing with "a case where the State seeks to reach activity undertaken by reservation Indians on nonreservation lands." 411 U.S. at 168, 93 S.Ct. at 1260. It also stated that, at least where the activities of non-Indians are concerned, "both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions." 411 U.S. at 179, 93 S.Ct. at 1266. And finally, the *Williams* test was described as "designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected." Ibid.

█ We thus conclude that it was not the intention of the United States Supreme Court in *McClanahan* to interpret Arizona's Enabling Act as totally withdrawing state jurisdiction over Indian Country, but rather as pre-empting its jurisdiction when the state's interest in a particular subject matter conflicts with a legitimate federal or tribal interest in the same subject matter. See 411 U.S. at 172, 93 S.Ct. 1257.

The most obvious example of this subject matter pre-emption is where the state attempts to exert its jurisdiction over the activities of Indians within the boundaries of the reservation as in *McClanahan*, supra. Another example of subject matter pre-emption is where a state attempts to exert its jurisdiction over a non-Indian on the reservation when the tribe has acted in a manner inconsistent with the state's attempt as in *Worchester v. Georgia*, 6 Pet. 515, 8 L.Ed. 483 (1832). In both examples, personal jurisdiction is irrelevant since the state has no power to adjudicate the matter.

When a state has subject jurisdiction, however, for the reason that the controversy arises off the reservation, a different problem presents itself. That is, under what circumstances, if any, may a state exert personal jurisdiction over a defendant who resides on an Indian reservation, be he an Indian or a non-Indian? If he is a non-Indian, personal jurisdiction appears to exist in spite of the fact that service takes place on the reservation. *Langford v. Monteith*, supra. We fail to see why the validity of service should be affected by the ancestry of the person served. So long as subject matter jurisdiction exists and service upon a non-Indian is valid, service upon an Indian should also be valid. The "however the Indians themselves may be exempt from that jurisdiction" language from *Langford*, we think refers to situations where the state court lacks subject matter jurisdiction. When that jurisdiction exists, however, service of process accomplishes the same purpose when an Indian is involved as when a non-Indian is.

We recognize a distinction between civil and criminal jurisdiction in this regard. See *State of Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir. 1969), cert. denied, 396 U.S. 1003, 90 S.Ct. 551, 24 L. Ed.2d 494 (1970); *Application of Denetclaw*, 83 Ariz. 299, 320 P.2d 697 (1958).

The reason for the distinction is that criminal process is meaningless without the power to enforce it. Such enforcement could well interfere with tribal self-government and thus disrupt the delicate balance of power between state and tribal government. In the case of civil process, however, this potential for interference is almost non-existent. The purpose of civil process is merely to notify the defendant of the pendency of an action. He is not subject to the contempt power of the court for failure to appear. Nor does entry of judgment against him authorize the same deputy sheriff who served notice upon him to execute against any property located on the reservation.

It may be that the Tribe could prohibit entry upon the reservation by sheriff's deputies altogether under the authority of *Worchester v. Georgia*, supra, but see *Dodge v. Nakai*, 298 F.Supp. 26 (D.Ariz. 1969), so that service upon an Indian or a non-Indian defendant would have to be made by a tribal police officer or pursuant to Arizona's long-arm statute; but we do not view the present situation to require a plaintiff to resort to these alternatives. No showing has been made that the Papago Tribe has undertaken the responsibility of serving all process on the reservation, nor even that it would prefer such a procedure. It may well be that a cooperative relationship exists between the Pima County Sheriff's Office and the Office of Tribal Police. It may also be that the undertaking of a task such as this by the tribal police would be undesirable for the reason that it would consume valuable time which could be better spent enforcing tribal laws.

We see no effrontery here and we are unwilling to disturb a possibly cooperative relationship between state and tribal police until we are shown a conflict. At present, we see no such conflict sufficient to serve as a basis for attacking service of process and thus the superior court's jurisdiction over the person of an Indian defendant

who has committed an act off the reservation. Since we are of the opinion that Arizona's Enabling Act does not prohibit this method of service, only a tribal ordinance will work a pre-emption.

The petition for special action is denied.

HATHAWAY, J., concurs.

NOTE: Pursuant to stipulation in open court by counsel, this cause was submitted to and decided by two judges.