556 P.2d 1

Edmund FRANCISCO, Petitioner,

v.

The STATE of Arizona, the Honorable J. Richard Hannah, Judge of the Pima County Superior Court, and the Pima County Superior Court, Respondents.

No. 12444–PR.

Supreme Court of Arizona,
En Banc.

Sept. 28, 1976.

James J. Purcell, Sandra K. Pharo, Papago Legal Services, Sells, for petitioner.

Dennis DeConcini, Former Pima County Atty., David G. Dingeldine, Pima County Atty. by David R. Ostapuk, Deputy County Atty., Tucson, for respondents.

James T. Van Bergen, William E. Strickland, Tucson, for amicus curiae The Papago Tribe.

HAYS, Justice.

Suit was brought in the Superior Court of Pima County by the State of Arizona in the name of Veronica Toro to determine the petitioner's alleged paternity of Veronica's child, Jonathan. The petitioner, Edmund Francisco, moved to dismiss, claiming lack of personal jurisdiction on the grounds that the Pima County Deputy Sheriff, who served the petitioner, was without authority to do so while on the Papago Indian Reservation. The motion was denied and a special action petition was filed in the Court of Appeals, Division Two, against the State of Arizona, the Honorable J. Richard Hannah, Judge of the Superior Court of Pima County, and the Pima County Superior Court. The Court of Appeals upheld the trial court's denial of the motion to dismiss and denied the special action relief sought. *Francisco v. State of Arizona*, 25 Ariz.App. 164, 541 P.2d 955 (1975). A motion for rehearing was denied. We accepted the Petition for Review to determine whether the trial court had properly acquired personal jurisdiction over the petitioner. We vacate the Court of Appeals decision and order the trial court to grant petitioner's motion to dismiss.

Petitioner and the mother of the child whose paternity is sought to be established are both Papago Indians. The child was born in Tucson, Arizona, and the mother and child have lived there since the child's birth. It was stipulated at trial that conception occurred in Tucson. The petitioner resides in Sells, Arizona, which is situated within the boundaries of the Papago Indian Reservation. The summons and complaint of the paternity proceeding below were served upon the petitioner by a Pima County Deputy Sheriff within the Papago Indian Reservation.

The issue presented for review is whether the Superior Court's assertion of in personam jurisdiction over the petitioner was proper.

■ The answer to this question must lie in the resolution of the question of whether the Pima County Deputy Sheriff had authority to serve process on an Indian while on an Indian reservation. The sheriff derives his authority from the Arizona Constitution, art. 12, §§ 3 and 4, as amended, and from the Arizona Revised Statutes, § 11-441, et seq. By virtue of this authority, when the sheriff or his deputy acts in his official capacity, the laws of Arizona are necessarily given effect. Thus, the deputy sheriff's authority while on a reservation must be defined by the state's ability to extend the application of its laws to an Indian residing on a reservation.

We are of the opinion that the laws of the state applying to service by a sheriff could not be applied to an Indian while on the reservation and therefore find, the deputy sheriff being without the proper authority, that the service of process was invalid and ineffectual and thus that the trial court was without personal jurisdiction over the petitioner.[1]

■ Our decision must be based on an examination of the extent to which the state's jurisdiction over Indian lands has been preempted by the federal government,

---

1. In holding that there was no personal jurisdiction over the petitioner due to an invalid service of process, we think it appropriate to point out that the trial court did indeed have subject matter jurisdiction. This has been conceded by the petitioner and is not here an issue. We further note that service of process could have validly been effected through the Papago Indian authorities who are vested with the power to serve process pursuant to tribal law.

as defined by the appropriate treaties, executive orders and Acts of Congress. Although the Indians and their lands have been deemed by the United States Supreme Court to constitute a sovereign and semi-independent entity, *Worcester v. Georgia,* 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483 (1832); *United States v. Kagama,* 118 U. S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), the Court has consistently taken the position that the federal government retains jurisdiction and control over the "whole intercourse" between the Indian tribes and our government. *Worcester v. Georgia, supra; Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The states have been allowed to give effect to their laws as applied to Indians on reservations when the laws did not infringe on tribal sovereignty and self-government but then only if there were no "governing Acts of Congress." *Williams v. Lee, supra.* When, however, such "governing Acts of Congress" do exist, the Court has made it clear that the test to be applied is whether, in light of all the relevant statutes and treaties, the states have been allowed by Congress to assume jurisdiction over the Indian lands in question. *McClanahan v. State Tax Commission of Arizona,* 411 U. S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

Based on the United States Supreme Court decision in *Kennerly v. District Court of Ninth Judicial District of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), it is apparent that the Civil Rights Act of 1968, 25 U.S.C. §§ 1321–1326, the successor to the Act of 1953, 67 Stat. 590, Public Law 280, is just such a governing Act of Congress. Thus, the determination of the limits of the states' jurisdictional powers must focus not on the extent of sovereignty the tribes possess but rather on the extent to which the states have been permitted by Congress to assert jurisdiction over Indians and their lands and, in effect, infringe on that sovereignty.

"[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption. (cite omitted) The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power." (citations and footnotes omitted). *McClanahan v. State Tax Commission, supra,* 411 U.S. at 172, 93 S.Ct. at 1262.

It is then the relevant statutes and, in this case, an executive order on which we must rely in determining the limits of Arizona's jurisdictional power and to which we now turn our attention.

■ There are no treaties between the Papago Indian tribe and the United States Government. Rather, the reservation was set aside by Executive Order No. 2524 signed by President Wilson on February 1, 1917. The Order made no specific guarantees exempting the Papagos from the State of Arizona's jurisdiction. However, the guarantee of exclusive sovereignty must be implied in such an Order.

*McClanahan v. State Tax Commission of Arizona, supra,* is analogous in this respect. In *McClanahan,* the court, in considering the preemptive effect that the Navajo treaty had on the ability of Arizona to impose an income tax on Indians for income earned on the reservation, noted the absence of a provision exempting the Navajo tribe from falling within the ambit of the state's taxing power. Nevertheless, the court reasoned, such an exemption must be implied in the treaty based on the fact that the treaty intended to grant the Indians exclusive sovereignty over their lands:

" . . . it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus

unsurprising that this Court has interpreted the Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation." 411 U.S. at 174–75, 93 S.Ct. at 1263–64.

In the instant case it is similarly implicit based on the fact that the reservation was set aside for the exclusive use and occupancy of the Papago Indian tribe, that the Executive Order intended to grant in the Papagos exclusive sovereignty over their lands. It would thus follow, based on the reasoning in *McClanahan,* that the Executive Order would preclude the extension of state law to Indians on the reservation, including the laws which effectuate the authority in the Sheriff to serve process.

We next consider the Arizona Enabling Act, 36 Stat. 569, the relevant language of which is also contained in our state constitution, article 20, paragraph fourth. The Enabling Act and article 20, fourth, disclaims

> ". . . all right and title . . . to all lands . . . owned or held by any Indian or Indian tribes . . . the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States."

The Arizona Supreme Court has construed the Act to disclaim only the state's proprietary interest in Indian lands and not its governmental interest therein. *Porter v. Hall,* 34 Ariz. 308, 271 P. 411 (1928). In *Porter,* the court stated:

> "We have no hesitancy in holding, therefore, that all Indian reservations in Arizona are within the political and governmental, as well as geographical, boundaries of the state, and that the exception set forth in our Enabling Act applies to the Indian lands considered as

property, and not as a territorial area withdrawn from the sovereignty of the state of Arizona." 34 Ariz. at 321, 271 P. at 415.

This holding of *Porter* has been repeatedly reaffirmed. *Kahn v. Arizona State Tax Comm'n,* 16 Ariz.App. 17, 490 P.2d 846 (1971); *Warren Trading Post Co. v. Moore,* 95 Ariz. 110, 387 P.2d 809 (1963); *Williams v. Lee,* 83 Ariz. 241, 319 P.2d 998 (1958), *rev'd on other grounds,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624 (1950); *Harrison v. Laveen,* 67 Ariz. 337, 196 P.2d 456 (1948).

Moreover, the United States Supreme Court in *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), in construing identical language in Alaska's Statehood Act, indicated that "absolute" federal jurisdiction means undiminished, not exclusive jurisdiction.

It is clear that the Arizona Enabling Act speaks only to the state's proprietary interest in Indian lands. Therefore, we find that it in no way precludes the state from exercising its governmental interest by way of service of process on an Indian on a reservation. At the same time, however, we note that the Act can not be read to sanction such an exercise of the state's jurisdiction in this case.

Finally, we consider the Civil Rights Act of 1968, 25 U.S.C. §§ 1321–1326.[2] The Civil Rights Act provides a method whereby the states can assume civil or criminal jurisdiction over Indians and Indian lands by appropriately amending its statutes or constitution and by acquiring the consent of the Indian tribe over whom jurisdiction is to be assumed. As summarized in *McClanahan, supra:*

> "Title 25 U.S.C. § 1322(a) grants the consent of the United States to States

---

2. The Civil Rights Act of 1968 repealed Section 7 of Public Law 280, the Act of 1953, 67 Stat. 588, which authorized the states to assume civil or criminal jurisdiction simply by "affirmative legislative action." The State of Arizona has provided in A.R.S. §§ 36–1801

and 36–1865, pursuant to Public Law 280, that its air and water pollution abatement laws will apply to all Indian lands and that the state will have civil and criminal jurisdiction to enforce the laws on the reservations.

wishing to assume criminal and civil jurisdiction over reservation Indians, and 25 U.S.C. § 1324 confers upon the States the right to disregard enabling acts which limit their authority over such Indians. But the Act expressly provides that the State must act 'with the consent of the tribe occupying the particular Indian country,' 25 U.S.C. § 1322(a), and must 'appropriately [amend its] constitution or statutes.' 25 U.S.C. § 1324." 411 U.S. at 177–78, 93 S.Ct. at 1265.

The United States Supreme Court in *Kennerly v. District Court of Ninth Judicial District of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), held that absent effective implementation of the Act of 1953, 67 Stat. 590 (also known as Public Law 280), which is the predecessor of the Civil Rights Act of 1968, a state is precluded from extending its jurisdiction to encompass Indians on the reservation. In *Kennerly,* Montana's exercise of civil jurisdiction over a Blackfeet Indian was held invalid in spite of the Indian tribe's consent to such jurisdiction because among other reasons, Montana has not taken the affirmative state action as was required by the Act of 1953. The Court noted that the requirement conditioning the assumption of state jurisdiction of "affirmative legislative action" by the state

"was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities." 400 U.S. at 427, 91 S.Ct. at 482.

■ For the purpose of delineating the extent of preemption, we can see no difference in the effect of non-implementation of the Act of 1953 and the Civil Rights Act of 1968. If the state has failed to take the requisite steps to confer upon itself jurisdiction under the Act, then, based on the holding in *Kennerly,* the state

must be held to be without jurisdiction. *Cf. Poitra v. Demarrias,* 502 F.2d 23 (8th Cir. 1974); *Annis v. Dewey County Bank,* 335 F.Supp. 133 (D.S.D.1971); *State Securities, Inc. v. Anderson,* 84 N.M. 629, 506 P.2d 786 (1973) (dissenting opinion); *Blackwolf v. District Court of Sixteenth Judicial District,* 158 Mont. 523, 493 P.2d 1293 (1972); *Martin v. Denver Juvenile Court,* 177 Colo. 261, 493 P.2d 1093 (1972). As stated in *Annis v. Dewey County Bank, supra,* at 136, "only strict compliance with 25 U.S.C.A. Secs. 1322 (a and b), 1326, can grant jurisdiction to the states over Indian lands."

■ Arizona has neither amended its constitution nor passed such appropriate legislation as would confer upon its officers the power to make service of process to Indians on Indian lands. Nor has the state acquired the requisite consent of the Papago Indian tribe to do the same. It is therefore clear that Arizona has not displayed a desire to assume either jurisdiction over Indian lands or its concomitant responsibilities.

Based on the foregoing discussion of the Executive Order which vested in the Papago Indian tribe the lands which comprise their reservation, and, more importantly, Arizona's failure to implement the Act of 1968 to acquire the jurisdiction it now seeks to assert, it is our opinion that Arizona has no authority to extend the application of its laws to an Indian reservation. We therefore hold that the deputy sheriff was without authority to validly make the service of process while within the boundaries of the Indian reservation. The Superior Court was thereby without personal jurisdiction over the petitioner.

The opinion of the Court of Appeals is vacated and the trial court is ordered to grant the petitioner's motion to dismiss.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.