585 P.2d 891

**WHITE MOUNTAIN APACHE TRIBE, an Indian tribe established pursuant to Executive Order, E. H. Loveness Lumber Sales Co., an Oregon Corporation d/b/a Pinetop Logging Company, qualified to do business in the State of Arizona, Basin Building Materials Company, an Oregon Corporation d/b/a Pinetop Logging Company, qualified to do business in the State of Arizona, Appellants,**

v.

**Robert M. BRACKER, Chairman of the Arizona Department of Transportation Board, Armand Ortega, Vice Chairman of the Arizona Department of Transportation Board, Edward J. McCarthy, Ralph A. Watkins, Jr., John W. McLaughlin, John Houston, William A. Erdmann, Robert M. Bracker and Armand Ortega, members of the Board, Arizona Department of Transportation, and William A. Ordway, Director, Arizona Department of Transportation, and Philip Thorneycroft, Assistant Director, Arizona Department of Transportation, Motor Vehicle Division, Appellees.**

No. 1 CA–CIV 3226.

Court of Appeals of Arizona,
Division 1,
Department B.

June 29, 1978.

Rehearing Denied Aug. 28, 1978.

Review Denied Oct. 3, 1978.

**284**

Jennings, Strouss & Salmon by Neil Vincent Wake, Leo R. Beus, Phoenix, for appellants.

Bruce E. Babbitt, Atty. Gen., by Donald O. Loeb, Michael M. Grant, Asst. Attys. Gen., Phoenix, for appellees.

## OPINION

JACOBSON, Judge.

This appeal involves the right of the State of Arizona to collect taxes from a non-Indian private carrier on gross receipts derived from its travel over Indian tribal roadways and a diesel fuel "use tax" expended from travel over these same roadways.

Appellants, E. H. Loveness Lumber Sales and Basin Building Materials Company, both Oregon corporations, are authorized to do business in Arizona as Pinetop Logging Company (Pinetop). Pinetop and the White Mountain Apache Tribe [1] brought an action against various officials of the State of Arizona, including the governor, the attorney general, the Arizona Corporation Commission, the Arizona Highway Department and the Arizona Highway Commission, seeking a refund of use fuel taxes and motor carrier license taxes paid under protest by Pinetop and for declaratory relief prohibiting the various defendants from attempting to regulate the relationship between Pinetop and the tribe. [2]

The trial court granted the Arizona Highway Commission's motion for partial summary judgment on Pinetop's claim of immunity from the state's use fuel and motor carrier license taxes. The judgment on the partial summary judgment was made appealable and was timely appealed. The

1. White Mountain Apache Tribe is a nominal party to this action. It has neither paid nor has the State of Arizona attempted to collect any taxes involved in this litigation from the White Mountain Apache Tribe.

2. Although the pleadings before the trial court and appellants' briefs before this court attempt to raise the issue of state control over tribal relationships, at the time of oral argument it

was admitted that the governor, attorney general and the Arizona Corporation Commission had been dropped from this litigation and the only issues deal with the motor fuel tax and motor carrier tax which the State of Arizona seeks to collect from Pinetop. Thus, the only active appellees are the Arizona Highway Department and the Arizona Highway Commission.

only issue remaining for trial was Pinetop's claim that under state law it was partially exempt from the motor carrier license tax due to the so-called "pulpwood exemption" to this tax. This issue proceeded to trial on a detailed stipulation of facts, depositional testimony and exhibits. The trial court entered judgment finding that Pinetop did not qualify for the "pulpwood exemption" and Pinetop likewise appeals from that judgment. By stipulation, these two appeals have been consolidated.

The undisputed facts show that Pinetop has contracted with the Fort Apache Timber Company (FATCO) to sell, load, and transport to the mill, timber growing on the Fort Apache Indian Reservation. FATCO is an economic organization created by the White Mountain Apache Tribe to oversee and control the harvesting and sale of lumber located on that reservation. The timber itself is owned by the United States for the benefit of the tribe and is under the supervision of the Department of the Interior, Bureau of Indian Affairs (B.I.A.), which has in turn, pursuant to statutory authority, entered into an agreement with FATCO for the harvesting, processing and selling of timber grown on the reservation. The White Mountain Apache Tribe has no treaty relationship with the United States, its reservation having been created by executive order.

Although B.I.A. has contracted with FATCO for certain lumbering operations, the B.I.A. directly selects the trees to be cut, dictates how many trees will be harvested, where logging roads will be built, and how they will be maintained. The B.I.A. also controls the type of equipment Pinetop can use to haul lumber, the speeds logging equipment may travel, and the width, length, height and the weight of loads.

Pinetop has had a contractual relationship with the tribe (approved by B.I.A.) since 1969. Its entire logging operation is conducted on the Fort Apache Indian Reservation and, with the exception of passing over state highways at a few locations,[3] Pinetop vehicles use only roads built and maintained by B.I.A., the tribe, or Pinetop itself.

In 1971, the Arizona Highway Department, pursuant to A.R.S. § 40–641 (motor carrier license tax) and A.R.S. § 28–1552 (use fuel taxes), sought to collect a motor carrier license tax of 2.5% of Pinetop's gross receipts from its carrier operations and the sum of eight cents per gallon for diesel fuel used by Pinetop in the propulsion of its motor vehicles. These taxes were paid under protest and suit was brought for their recovery.

A.R.S. § 40–601(A)(10) provides a "pulpwood exemption," that is, any private motor carrier in the business of harvesting pulpwood logs is exempt from the 2.5% common carrier license tax.

It appears that 60% of the logs actually harvested by Pinetop are ultimately used for pulpwood. All logs harvested and hauled by Pinetop are delivered to FATCO milling operations at Whiteriver, Arizona. At that point, the logs are segregated according to size for milling. If a particular log cannot be processed in the two mills located at Whiteriver, it is sent to a "chipper" which reduces the log to chips which are then sold to Southwest Forest Industries Paper Mill in Snowflake, Arizona. Pinetop does not harvest or haul pulpwood logs or chips directly to Southwest Forest Industries nor does it have any contractual relationship with Southwest Forest Industries.

By affidavit, it is alleged that since the tribe and Pinetop did not contemplate the tax liability of Pinetop for its logging operations, the tribe has agreed to pay the taxes involved in this litigation to Pinetop.

Pinetop contends its operations on the Fort Apache Indian Reservation are immune from state taxation on three theories: (1) that there exist statutory or constitu-

---

3. Pinetop has kept records concerning the amount of fuel used while traveling on state highways and does not seek a refund for fuel taxes or motor carrier license taxes attributable to state highway use.

tional prohibitions against such taxation; (2) that such taxation is prohibited by reason of federal preemption; and (3) that such taxation results in an infringement on Indian self-government.

In addition, Pinetop asserts that in any event, under state law it is entitled to a partial exemption on the motor license tax under the so-called "pulpwood exemption." These contentions will be discussed in the order presented.

## STATUTORY PROHIBITIONS

■ Arizona has sought the collection of taxes in dispute under A.R.S. § 40–641 and A.R.S. § 28–1552. These statutes provide in part:

A.R.S. § 40–641:

"A. In addition to all other taxes and fees:

"1. Every common motor carrier of property and every contract motor carrier of property shall pay to the state, on or before the twenty-fifth day of each month, a license tax of two and one-half percent of the gross receipts from the carrier's operations within the state for the preceding calendar month . . . ."

A.R.S. § 28–1552:

"For the purpose of partially compensating the state for the use of its highways, an excise tax is imposed at the rate of eight cents per gallon upon use fuel used in the propulsion of a motor vehicle on any highway within this state . . ."

Pinetop argues that the Arizona Enabling Act, 36 Stat. 557, 569, makes it immune from the imposition of the taxes involved. In this regard, it concedes that the Arizona courts' interpretation of that act would not prohibit the tax sought to be imposed.[4]

Rather, Pinetop argues that since the Arizona Enabling Act was the result of a federal statute, federal interpretation must prevail. It then argues that *McClanahan v. State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), can be construed as holding that the Arizona Enabling Act prohibits the taxation sought here.

We do not determine here whether federal law has usurped the power of the courts of the State of Arizona to interpret its own organic law, for in our opinion, *McClanahan* does not have the force Pinetop attributes to it, and other federal cases interpreting other similar enabling acts come to a contrary conclusion.

The Arizona Enabling Act, 36 Stat. 557, 569 provides in part:

"That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title . . . to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States . . . but nothing herein . . . shall preclude the said State from taxing as other lands and other property are taxed any lands and other property outside of an Indian reservation owned or held by any Indian . . . ."

In *McClanahan*, the United States Supreme Court held that this portion of the Enabling Act was an expression of Congress' assumption that the states lacked jurisdiction over *Indians* living on the reservation. *McClanahan v. State Tax Commission, supra*, 411 U.S. at 175, 93 S.Ct. at 1264, 36 L.Ed.2d at 137. As to that portion of the Enabling Act allowing the taxation of non-reservation Indians, *McClanahan* held:

"It is true, of course, that exemptions from tax laws should, as a general rule, be clearly expressed. But we have in the

---

4. *See Industrial Uranium Co. v. State Tax Comm'n.*, 95 Ariz. 130, 387 P.2d 1013 (1963) (upholding applicability of Arizona transaction privilege tax on non-Indian corporation engaged in mining operations on Navajo Reservation); *Kahn v. Arizona State Tax Comm'n.*, 16 Ariz.App. 17, 490 P.2d 846 (1971), appeal dismissed for lack of federal question, 411 U.S. 941, 93 S.Ct. 1917, 36 L.Ed.2d 404 (1973) (holding that enabling act did not withdraw reservation lands from jurisdiction of Arizona); *Pima County v. American Smelting & Refining Co.*, 21 Ariz.App. 406, 520 P.2d 319 (1974); *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976).

past construed language far more ambiguous than this as providing a tax exemption for *Indians*, [citations omitted], and we see no reason to give this language an especially crabbed or restrictive meaning." (emphasis added) 411 U.S. at 176, 93 S.Ct. at 1264, 36 L.Ed.2d at 138.

However, there is nothing in *McClanahan*, which would indicate that Arizona's Enabling Act intended to prohibit the taxation of non-Indians whose contractual business arrangements with a corporation on an Indian reservation formed by an executive order required them to perform services on that reservation. *See Dept. of Revenue v. Hane Const. Co.*, 115 Ariz. 243, 564 P.2d 932 (App.1977).

Moreover, it has long been held that enabling acts such as Arizona's did not afford protection for non-Indians from state taxation, even for activities conducted on Indian reservations. Thus, as early as 1896, in the case of *Truscott v. Hurlbut Land & Cattle Co.*, 73 F. 60 (9th Cir. 1896), it was held that personal property belonging to non-Indians located on an Indian reservation was subject to state taxation in spite of Montana's Enabling Act. *See also Utah & N. Ry. v. Fisher*, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1885) holding Idaho could properly tax a non-Indian corporation owned railroad running through an Indian reservation.[5]

However, we understand Pinetop's argument to be that the use fuel tax and the motor carrier license tax are levied on Pinetop's use of travelled road and as such falls within the Enabling Act language. We disagree with this characterization of the taxes involved. Neither tax is directly related to Indian lands, nor are they property taxes. The use fuel tax is an excise tax imposed upon the use of diesel fuel consumed in the propulsion of motor vehicles within the State of Arizona. A.R.S. § 28–1552. The motor carrier license tax is imposed on gross receipts and as such is in the nature of a tax on the privilege of doing business

in this state. *See Shaw v. State*, 8 Ariz. App. 447, 447 P.2d 262 (1968). Neither tax has as its nexus, transactions between Pinetop and an Indian tribe, rather both taxes are based upon activities Pinetop has seen fit to conduct within the confines of the State of Arizona. In this sense, for Enabling Act purposes, it is as immaterial that these activities are conducted on an Indian reservation as it would be if they were conducted by Pinetop on a national forest. *See Wilson v. Cook*, 327 U.S. 474, 66 S.Ct. 663, 90 L.Ed. 793 (1946); *Dept. of Revenue v. Hane Const. Co., supra.*

We therefore reject Pinetop's contention that Arizona's Enabling Act prohibits these taxes.

■ Pinetop next contends that 25 C.F.R. § 1.4 (1977) ousts the state from imposing the taxes sought here. This federal regulation provides in part:

"(a) . . . none of the laws, ordinances, codes, resolutions, rules or other regulations of any State . . . limiting, zoning or otherwise governing, regulating, or controlling the use . . . of any . . . personal property . . . shall be applicable to any such property . . . *belonging to any Indian or Indian tribe* . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." (emphasis added)

The state suggests that this regulation is an unauthorized legislative action by the Secretary of the Interior and that as such is invalid. *See Norvell v. Sangre de Cristo Development Co.*, 372 F.Supp. 348 (D.N.M. 1974), *rev'd.* for lack of controversy, 519 F.2d 370 (10th Cir. 1975). We need not make that determination here, however, for in our opinion the regulation, if valid, is not applicable to the facts in this case.

The regulation, by its own terms, seeks to limit the applicability of state laws to real

---

**5.** For other cases upholding the right of a state to tax non-Indian transactions, although occurring on an Indian reservation, *see Moe Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Thomas v.* *Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898); *G. M. Shupe, Inc. v. Bureau of Revenue*, 89 N.M. 265, 550 P.2d 277 (1976); *Chief Seattle Properties, Inc. v. Kitsap County*, 86 Wash.2d 7, 541 P.2d 699 (1975).

or personal property "belonging to any Indian or Indian tribe." Again, Pinetop seeks to characterize the cases involved here as somehow related to tribal property. As previously pointed out, this characterization is incorrect. These taxes are levied upon the activity of Pinetop, a non-Indian. For the reasons we found Arizona's Enabling Act to be inapplicable, we likewise find 25 C.F.R. § 1.4 (1977) to be inapplicable to prohibit the levying of these taxes.

■ At this point, we deal with the bare allegation that the White Mountain Apache Tribe has agreed to reimburse Pinetop for its tax liability should these taxes be upheld. We first note that if the tribe has agreed to pay the taxes due here, being under no contractual or legal obligation to do so, it is a mere volunteer and as such cannot complain. *See Maricopa County v. Arizona Citrus Land Co.,* 55 Ariz. 234, 100 P.2d 587 (1940).

■ On the other hand, if the argument is that the economic burden of these taxes will ultimately fall on the tribe (by Pinetop raising the price of its services to the tribe to cover this expenditure), such an economic burden on a non-tax-paying entity will not invalidate the state tax. *United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *Murray v. State,* 62 Wash.2d 619, 384 P.2d 337 (1963). As was stated in *United States v. City of Detroit, supra* :

> "At the same time it is well settled that the Government's constitutional immunity [United States immunity from state taxation] does not shield private parties with whom it does business from state taxes imposed on them merely because part or all of the financial burden of the tax eventually falls on the Government." 355 U.S. at 469, 78 S.Ct. at 476, 2 L.Ed.2d at 427.

We therefore reject Pinetop's "ultimate burden" argument.

## PREEMPTION BY FEDERAL GOVERNMENT

■ Pinetop next argues that the federal government has so preempted the field of harvesting tribal lumber, that state taxation in the area is prohibited. This contention is bottomed on the rationale of *Warren Trading Post Co. v. Arizona State Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). In *Warren Trading Post,* the United States Supreme Court held that the State of Arizona could not impose a transaction privilege tax on Indian traders, as the federal government had so regulated the Indian trading field including making "sure that prices charged are fair and reasonable," that a preemption of the area from state interference had occurred. In so holding, the Court noted:

> "This state tax on gross income would put financial burdens on appellant or the Indian with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner." 380 U.S. at 691, 85 S.Ct. at 1246, 14 L.Ed.2d at 169.

Pinetop points to the extensive federal regulations dealing with the harvesting of tribal timber,[6] and claims a similar preemption here. In particular, Pinetop contends that the federal regulations seek to insure the financial integrity of the timber operation, the utilization of Indian labor, the protection of recreational or aesthetic values of the forest, and the preservation and development of grazing and wildlife. Pinetop then contends the taxation sought here will interfere with these federally mandated objectives.

First, we doubt that the combined annual use fuel and the motor carrier license tax of $9,000.00 assessed against Pinetop is going to seriously interfere with the tribe's objectives when its net revenues from timbering operations exceeds $1,500,000 per year. However, we do not place much reliance upon this lack of "interference." Rather, in

6. *See, e. g.,* 25 C.F.R. § 141.1, *et seq.* (1977).

our opinion, the federal regulations involved here do not result in a preemption of the field by the federal government.

In *Commonwealth of Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956) a three-prong test was enunciated to determine whether a federal regulation had preempted a particular field:

"*First,* '[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" 350 U.S. at 502, 76 S.Ct. at 480, 100 L.Ed. at 652, quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1946).

\* \* \* \* \* \*

"*Second,* the federal statutes 'touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject.'" 350 U.S. at 504, 76 S.Ct. at 481, 100 L.Ed. at 653, quoting *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459.

\* \* \* \* \* \*

"*Third,* enforcement of state . . . acts presents a serious danger of conflict with the administration of the federal program." 350 U.S. at 505, 76 S.Ct. at 482, 100 L.Ed. at 654.

Applying these tests, we note that none of the regulations quoted to us seek to control the licensing of non-Indian haulers, the prices charged for that hauling (although Pinetop's contracts are subject to B.I.A. approval), the federal taxing of any operation of Pinetop, nor do the federal regulations speak of who may conduct the hauling operations. Thus, unlike *Warren Trading Post,* there is no specific federal regulation seeking to regulate the "fair and reasonable" prices Pinetop may charge for its services.

As to the second criteria (dominant federal interest in the field) while the federal government may have a dominant interest in the harvesting of tribal lumber, there is nothing to indicate that this same interest was intended " . . . to preempt the field of regulating commercial activities between Indians and non-Indians." *Palm Springs Spa, Inc. v. County of Riverside,* 18 Cal.App.3d 372, 379, 95 Cal.Rptr. 879, 883 (1971). In particular, we find nothing to indicate that the federal government intended to dominate and exclusively control the right to tax the privilege of doing business in the state and the consumption of motor vehicle fuel within the state, an area traditionally left to the states. The federal regulations, even by inference, are silent on the subject.

As to the third criteria (conflict with federal administration) Pinetop raises the specter of state laws impinging the financial integrity of its timber operations, or "will force the tribe to alter its desired methods of operation in order to avoid these taxes."[7] As previously pointed out, the tribe has no liability for these taxes and thus this ghost is merely a kindred spirit to its "ultimate financial burden" argument, which we have previously rejected.

Finally, Pinetop argues that a factual dispute exists as to the preemption question. We disagree. Assuming that the federal regulations have the effect contended by Pinetop, we find no federal preemption of Pinetop's operation with the tribe which would preclude the state taxes sought to be imposed here.

## IMPINGEMENT OF TRIBAL RIGHT OF SELF–GOVERNMENT

■ Pinetop's attack under this heading is multi-faceted. Pinetop argues that these taxes cause interference in the following areas:

1. With tribal judgments about who may use tribal roads.

2. With control of its timber resources by conditioning non-Indian use upon payment of taxes to the state.

3. With tribal choice of the means of managing and harvesting lumber.

7. Reply Brief for Appellant at 14.

4. With the planning and scope of reservation economic development.
5. With the tribe's building of passable roads.
6. With the tribe's ability to tax the same activities.

In our opinion, these "infringements" are more imaginary than real. In the final analysis, most of these arguments are based on the hypothesis that the ultimate burden of Pinetop's having to pay approximately $9,000.00 annually in excise privilege taxes is going to be borne by the tribe. As previously suggested, the idea that payment of this sum is going to bring a net million and half dollar operation to its knees is pure sophistry. Moreover, Pinetop has failed to cite us to any case which holds that a state tax imposed upon a non-Indian doing business with a tribe results in an "infringement" of the tribe's right of self government.[8] The weight of authority is clearly to the contrary. See *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253 (9th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977); *Chief Seattle Properties, Inc. v. Kitsap County*, 86 Wash.2d 7, 541 P.2d 699 (1975); *Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971); *Moe v. Confederated Salish and Kootenai Tribes, supra; Kahn v. Arizona State Tax Comm'n., supra; Industrial Uranium Co. v. State Tax Comm'n., supra.*

Also, Pinetop's Indian Commerce Clause argument based upon Article 1, § 8 of the United States Constitution, has been sufficiently answered in *Moe v. Confederated Salish and Kootenai Tribes, supra.*

Based on the foregoing authority, we reject Pinetop's infringement argument.

## PULPWOOD EXEMPTION

Under the statutory scheme of classification of motor carriers, "private motor carriers" are exempt from the payment of the motor carrier license tax. A.R.S. § 40–601(A)(10) provides that carriers who are engaged in:

"transporting of pulpwood logs which are consumed in the manufacture of pulp or paper within the state of Arizona by a person in the business of harvesting such pulpwood logs shall be deemed . . . to be a private motor carrier when so engaged. For purposes of this paragraph 'pulpwood logs' means logs which are used or intended for use as a raw material in the manufacture of pulp or paper."

Pinetop contends that since 60% of the logs it harvests ultimately end up as pulpwood, it is entitled to an exemption on 60% on its gross revenues derived from its logging operations. The state on the other hand argues that since Pinetop has no contractual relationship with Southwest Forest Industries (the paper manufacturer) and since it does not actually haul the pulpwood logs or chips to the Southwest Forest Industries Paper Mill, it cannot claim the exemption. The state also argues that since the waste from logs actually destined for finished timber is likewise sent to Southwest Forest Industries, it would be virtually impossible to ascertain the extent of the exemption. Since Pinetop claims no exemption for such waste, we do not consider this aspect of the state's argument.

The proper interpretation of the so-called "pulpwood exemption" requires an historical analysis of the amendment creating that exemption. In 1969, the Arizona Supreme Court held in *Boyes v. State*, 105 Ariz. 34, 459 P.2d 86 (1969) that the transportation of pulpwood logs by one who also harvested those logs was not a private carrier and that the transportation was not merely an incident of the commercial enterprise of harvesting and thus was not entitled to an exemption from the tax imposed.

8. *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977), cited by Pinetop dealt with the attempted imposition of local zoning ordinances on Indian land. Likewise, *Eastern Navajo Industries, Inc. v. Bureau of Revenue*, 89 N.M. 369, 552 P.2d 805 (N.M.App.1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 810 (1977), also cited by Pinetop dealt with the purported taxation of a corporation which was an agency of the Navajo Tribe and in which the majority of stock was owned by Indians.

The following year, the legislature amended the statute so as to specifically provide that the transportation of pulpwood logs was to be considered as "incidental" to the commercial enterprise of pulpwood harvesting, thus entitled to an exemption.

With this background in mind, we see nothing that requires that the harvester/transporter in order to be entitled to the exemption, complete the journey from the forest to the mill. Rather, the point of inquiry is whether the logs harvested and subsequently transported are "intended for use as a raw material in the manufacture of pulp or paper."

The stipulated facts here are that at the time of harvest, because of size, 60% of the trees cut by Pinetop are ultimately "intended for use" as pulpwood. While it is true that the actual segregation of the logs occurs at the FATCO lumber mill at Whiteriver, it would do violence to the parties' stipulated facts to suggest that at the time of harvesting, the parties had no knowledge as to what trees were destined for pulpwood usage.

The state argues that exemptions to taxes are to be strictly construed. However, the interpretation urged by the state would require us to add to the phrase "a pulpwood harvester transporting such pulpwood logs shall be deemed to be a private motor carrier when so engaged," the words "and the harvester completes the journey to the paper mill."

Under the stipulated facts here, since the state does not argue that the apportionment of the exemption is improper, Pinetop is entitled to a 60% exemption on gross revenues derived from its transportation activities.

The judgments appealed from are affirmed in part and reversed in part and the matter remanded for a determination of the amount of refund due Pinetop as a result of the "pulpwood exemption."

EUBANK, P. J., and OGG, J., concur.